UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL KLIMAS,<br>    Plaintiff, | :   No. 3:08cv694 (WWE)<br>:<br>: |
| v. | :<br>: |
| THERESA C. LANTZ. PETER J.<br>MURPHY, MICHAEL P. LAJOIE,<br>    Defendants. | :<br>:<br>: |

## MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

In this action, plaintiff Daniel Klimas, an incarcerated prisoner, brings this civil rights action against defendants Theresa Lantz, Commissioner of the Connecticut Department of Corrections; Peter Murphy, Warden of the MacDougall-Walker Correctional Institution; and Michael Lajoie, Director of Security for the Department of Correction. He claims that defendants are liable for violations of his First and Fourteenth Amendment rights based on the treatment of his mail during his incarceration.

The parties have filed cross motions for summary judgment. For the following reasons, defendants' motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied.

## BACKGROUND

The parties have submitted statements of undisputed facts, exhibits and supporting materials that reveal the following undisputed facts.

Plaintiff is a World Hell's Angels Motorcycle Club ("HAMC") member of the

1

Nomads Chapter in Connecticut[1] and is currently incarcerated in MacDougall-Walker Correctional Institution, a state prison in Connecticut. HAMC is an incorporated corporation with approximately 341 chapters worldwide.

Plaintiff was a Sergeant-at-Arms in HAMC at the time of his sentencing for the murder of Todd Festa, a prospect for HAMC, who had been working for the Connecticut State Police as an informant.

HAMC members must be Caucasian, Hispanic or Asian males over 21 years of age. HAMC members wear patches on the back of a leather or denim vest to indicate their membership status. Prospective members are brought into chapters through a lengthy process.[2] A full member of HAMC is also known as a "full patch" member.

Lieutenant Terry Katz, who previously worked with the Maryland State Police Intelligence Unit investigating "disturbance groups" and the Special Services Division focusing primarily on motorcycle gang cases, has proffered that HAMC is a "known criminal entity/enterprise" that has engaged in violent acts and intimidation as evidenced by the continuing prosecution of HAMC members for federal and state crimes. He has opined that having incarcerated HAMC members in proximity to rival gang members presents the danger of potential confrontations and assaults based on gang problems outside of the prison. He stated that HAMC members "can be a threat

---

[1]As a World HAMC member of the Nomads Chapter, plaintiff is an accepted member of HAMC anywhere in the world and he can start a HAMC chapter anywhere in the world. Plaintiff arrived at prison with tattoos that reflect his membership in HAMC.

[2]The term "associate" or gang associate has been established for gang members who have established a relationship with a motorcycle gang. For every gang member, an estimated ten associates support the gang in its legal and illegal activities.

... because of who they are and what they have done in the past" and "what happens in the street often times comes into the prison system." According to Katz, HAMC members communicate through the prison system internationally through messages, literature and codes. The Big House Chapter ("BHC") newsletter is used to update incarcerated HAMC members worldwide about HAMC business.

The United States Department of Justice Gang Unit has designated HAMC as an outlaw motorcycle gang and an organization involved in criminality. HAMC and its members are also listed in the National Crime Information Center's ("NCIC") Violent Gang and Terrorist Organizations File as meeting the NCIC's definition of a gang.

The Connecticut Department of Correction ("DOC") has a zero tolerance policy towards gangs and gang-related material, which includes group insignia. DOC's policies are designed to try to prevent gangs from organizing, recruiting or banding together. DOC also views the HAMC connection and alignment with white supremacy groups as a threat to the safety and security of inmates and staff.

Administrative Directive 6.14 defines a "Security Risk Group" as "[a] group of inmates, designated by the Commissioner, possessing common characteristics, which serve to distinguish them from other inmates or groups of inmates and which as a discrete entity, jeopardizes the safety of the public, staff or other inmate(s) and/or the security and order of the facility." The Directive provides the following seven recommendation factors for consideration in the determination of a Security Risk Group: (1) history and purpose of the group; (2) organizational structure of the group; (3) propensity for violence by the group or its individual members; (4) specific violent acts or intended acts of violence that can be reasonably attributed to the group as an

entity; (5) specific illegal or prohibited acts, to include the intention or conspiracy to commit such acts, that can be associated with the group, within the facilities and in the community, as an entity; (6) demographics of the group to include group size, location, patterns of expansion or decline of group membership; and (7) the degree of threat to community or facility security.  Directive 6.14 also the defines a "Disruptive Group," as "a structured or unstructured group designated by the Director of Security" meeting one or more of the necessary factors comprising a "Security Risk Group" that exhibit behavior that "jeopardizes the safety of the public, staff or other inmate(s) and/or the security or order of the facility."

     Administrative Directive 10.7 addressing outgoing inmate correspondence provides that such correspondence may be restricted, confiscated or returned to the inmate if review discloses "correspondence or materials which contain or concern," inter alia, transport of contraband, plans for criminal activity, violations of unit or Department rules, letters written in code, information that would create a clear and present danger of violence and physical harm, or threats to safety and security.  Directive 10.7 provides that incoming inmate general correspondence may be rejected after inspection if such review discloses correspondence or material that would "reasonably jeopardize penological interests," including, inter alia, letters written in code, plans for criminal activity and/or transport of contraband, or plans for activities in violation of facility or Department rules.  In the event of rejection, the Directive provides for notice and opportunity for the inmate to seek review of that decision.

On January 3, 2008, Director of Security Michael Lajoie issued a notice designating HAMC as a "Disruptive Group." Other outlaw motorcycle groups are also so designated.

Captain Michael Beaudry has been Security Risk Group/Investigator Intelligence Coordinator at MacDougall-Walker Correctional Institution for more than eight years. Captain Beaudry supervises the officers who inspect inmate mail correspondence.

In this case, DOC rejected plaintiff's correspondence on the basis that such materials exhibited references to HAMC. DOC asserts that such HAMC-related symbols and messages can contain messages used to send out orders for criminal activity. HAMC references found in plaintiff's correspondence include, <u>inter alia</u>, return addresses of HAMC clubhouses, which operate as the business addresses for certain chapters; the name "Rick Prospect," which indicates an individual in training to become a member of HAMC; Winged Death's heads; and Nazi SS lightning bolts.

DOC has also intercepted the BHC newsletter addressed to plaintiff that includes, <u>inter alia</u>, updates of the status of HAMC members who have been arrested, indicted, convicted, or released; changes in membership status; law enforcement initiatives; and inspirational essays.

Lieutenant Katz has reviewed correspondence mailed to and from plaintiff during his incarceration. He observed that plaintiff's correspondence contained what he considers to be coded words, including "Filthy Few" and "Dequiallo." Katz explained that he has found that "Filthy Few" refers to the patch awarded for committing or being involved in the commission of a murder for HAMC, and that "Dequiallo" refers to the patch awarded to a HAMC member who has resisted arrest or fought the police.

Plaintiff has been informed that any mail with HAMC logos or insignia will continue to be rejected as per the DOC Security division due to security and safety concerns stemming from HAMC consideration as a criminal enterprise.

**DISCUSSION**

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which that party has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Liberty Lobby, 477 U.S. at 24. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for that party. See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. See Patterson v.

County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).  The same standard is applicable to cross motions for summary judgment.

First Amendment

Plaintiff alleges that defendants have violated his First Amendment rights through unconstitutional detention of his mail.

It is well settled that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).  Inmates' rights, however, are limited and restricted due to the fact of their confinement and the legitimate goals and policies of correctional facilities. Bell v. Wolfish, 441 U.S. 520, 546 (1979).

The Supreme Court has established that restrictive prison regulations, including restrictions on First Amendment rights, are valid if reasonably related to legitimate penological interests and are not "an exaggerated response to prison concerns." Turner v. Safley, 482 U.S. 78, 89 (1987).  The Court must consider four factors for assessing reasonableness of a regulation: (1) whether a valid, rational connection between the prison regulation and the legitimate governmental interest exists; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the challenged regulation in relation to proposed alternatives.  Johnson v. Goord,

445 F.3d 532, 535 (2d Cir. 2006).  The burden is on the inmate to disprove the validity of the regulation at issue.  <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2008).  Application of these factors demonstrates that the contested regulation of plaintiff's First Amendment rights is reasonably related to penological interests.[3]

<u>Connection between regulation and legitimate governmental interest</u>

Plaintiff argues that DOC's regulation of plaintiff's communications pursuant to Directive 10.7 is not rationally connected to the penological interest of maintaining prison security.  Plaintiff's mail related to HAMC was rejected pursuant to Directive 10.7 relevant to correspondence concerning contraband; plans for criminal activity; letters of materials written in code; threats to the safety or security of staff, other inmates, or the public, facility order, discipline or rehabilitation; or any other reason reasonably related to a legitimate penological interest.

This Court has held that Directive 10.7 is "neutral in character" and is concerned with increasing safety and alleviating the security items posed by certain items being mailed to inmates from outside of prison." <u>Sadler v. Lantz</u>, 2011 WL 4561189 (D. Conn. Sept. 30, 2011).

DOC maintains that permitting correspondence that displays HAMC materials poses a security risk because display of HAMC indicia could be used to show group presence and strength or to recruit new members.  Further, such correspondence can put plaintiff at risk for possessing materials that are targeted by other rival groups.

---

[3]Defendants argue that the doctrine of collateral estoppel applies.  However, the Court will review the facts of the instant case on the merits.

In support of the rationale for rejecting plaintiff's mail, defendants have submitted the affidavits of prison professionals including Warden Murphy, Captain Beaudry, Director Lajoie, and Commissioner Lantz.  The Court must give deference to prison officials' professional judgment.  Beard v. Banks, 548 U.S. 521, 522 (2006).  Prison officials must be permitted to anticipate and take reasonable steps to forestall violence that could be the probable consequences of certain speech.  Jones v. North Carolina Prisoners' Labor Union, Inc, 433 U.S. 119, 132-33 (1977).  Thus, defendants have shown that materials bearing HAMC indicia or code have been deemed to constitute threats to the safety or security of staff, other inmates, public facility order, discipline or rehabilitation.  Accordingly, regulation of plaintiff's HAMC-related mail pursuant to Directive 10.7 is rationally connected to a legitimate government interest to prevent increased violence or criminal activity.[4]

Alternative means available for exercising First Amendment right

As to the second factor, the alternatives for exercising a restricted right need be available but not ideal.  Overton, 539 U.S. at 135.  Here, plaintiff can exercise his free speech rights by communicating with people on the telephone and receiving visits with individuals who are reputed to be HAMC members.  To the extent permitted by Directive 10.7, plaintiff may send correspondence to a HAMC member so long as it does not contain HAMC logos or code and/or is not related to HAMC activities.  Thus, defendants have satisfied the second factor.

---

[4] The fact that plaintiff may have received or sent correspondence bearing HAMC-related indicia at some time during his incarceration does not undermine the legitimacy of defendants' rationale for rejecting his mail.

<u>Consideration of ready alternatives and impact of accommodation on guards and other inmates, and on the allocation of prison resources</u>

"[P]rison officials do not have to set up and then shoot down every conceivable method of accommodating the claimant's constitutional complaint." <u>Turner</u>, 482 U.S. at 90.  As the Supreme Court explained, an available alternative weighs against regulation only if it accommodates the prisoner's rights "at de minimus costs to valid penological interests." <u>Id.</u> at 91.  No such alternative has been shown in this case.

Plaintiff submits that he could read his mail under the supervision of prison staff or receive the mail and discard it immediately.  However, these alternatives present untenable burdens on staff and prison resources.

Such alternatives would undermine the penological interest in security by allowing plaintiff to receive messages through coded correspondence and by giving the appearance that DOC openly endorses plaintiff's continuing contact with HAMC.  Further, such alternatives would tax the mail personnel or other staff who need to supervise plaintiff's review of his mail; these alternatives would also delay the processing of general correspondence.  The burden would be particularly significant because such practices would have to be applicable to all inmates in order to ensure fairness.

Accordingly, the Court finds that plaintiff has not satisfied his burden to show that regulation of his mail pursuant to Directive 10.7 is invalid.  Defendants' evidentiary materials underscore that the challenged practice is reasonably related to legitimate penological interests and is not an exaggerated response to prison concerns.  Summary judgment will be granted in defendants' favor on this claim.

**Fourteenth Amendment**

Plaintiff asserts that his property – – his mail – – was confiscated without a fair proceeding as guaranteed by the Fourteenth Amendment Due Process Clause.

The Due Process Clause of the Fourteenth Amendment requires that, generally, a person must be afforded the opportunity for a hearing prior to being deprived of a constitutionally protected liberty or property interest. U.S. Const. amend XIV, § 1; Bd. of Regents v. Roth, 408 U.S. 564, 569-70 & n. 7 (1972). Thus, in order to sustain an action for deprivation of property without due process of law, a plaintiff must identify a property right, and show that the state actor has deprived plaintiff of that right without due process. McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001).

The fundamental requisite of procedural due process is the opportunity to be heard. See Boddie v. Connecticut, 401 U.S. 371, 377 (1971). This opportunity must be granted within a meaningful time and manner. Armstrong v. Manzo, 380 U.S. 545, 552 (1965). Further, the hearing must be "appropriate to the nature of the case." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).

In this instance, the plaintiff's interest in uncensored communication by letter represents a legitimate liberty interest that is due procedural due process protection. Procunier v. Martinez, 416 U.S. 396, 417 (1974), rev'd in part on other grounds, Thornburgh v. Abbott, 490 U.S. 401 (1989). In Procunier, the Supreme Court set forth that the minimum procedural safeguard relative to rejection of an inmate's personal correspondence must include the following: (1) the inmate must receive notice of the rejection of a letter written by or addressed to him; (2) the author of the letter be given reasonable opportunity to protest that decision, and (3) complaints must be referred to

a prison official other than the person who originally disapproved the correspondence. Id. at 335. Directive 10.7 clearly incorporates these safeguards in its provisions concerning "Notice of Rejection" for incoming and outgoing correspondence. Summary judgment will be granted in defendants' favor on this claim.

Vagueness

Plaintiff asserts further that Directive 10.7 violates the Due Process Clause because it is unconstitutionally vague.

A regulation is impermissibly vague if it either fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or it authorizes arbitrary and discriminatory enforcement. Hill v. Colorado, 530 U.S. 703, 732 (2000). Vagueness challenges brought on the basis of a due process violation are evaluated in light of the circumstances of the case on an as-applied basis. Maynard v. Cartwright, 486 U.S. 356, 361 (1988). The vagueness doctrine does not require perfect precision in the drafting of laws. Rose v. Locke, 423 U.S. 48, 49 (1972). The degree of vagueness that is constitutionally tolerated depends upon the nature of the enactment: Economic regulation is subject to a less strict vagueness test; enactments with criminal penalties are required to have a "greater degree of precision;" and more stringent review is afforded to a law that threatens to inhibit the exercise of constitutionally protected rights. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982).

In reviewing the challenged regulation, the Court should look to the words of the regulation, to the interpretations given to analogous regulations, and to the

interpretation of the statute given by those charged with enforcing it.  Grayned v. City of Rockford, 408 U.S. 104, 110 (1972).

Here, as previously discussed, Directive 10.7 implicates plaintiff's First Amendment right to free speech.  However, the Court remains mindful that an inmate's constitutional rights are more limited in scope than those held by society at large, and some First Amendment rights are inconsistent with legitimate penological objectives. Shaw v. Murphy, 532 U.S. 223, 229 (2001).  Here, Directive 10.7 gives reasonable notice of the proscribed speech by enumerating the specific circumstances where correspondence will be disapproved.

Plaintiff argues that Directive 10.7 affords unfettered discretion.  In support of this position, plaintiff asserts that in his deposition, Director Lajoie could not articulate exceptions to the Directive or its application without viewing the correspondence. However, Director Lajoie, who delegates the screening of the mail to a staff member as provided in Directive 10.7, explained that plaintiff can send a birthday card to a known HAMC member if the card bears no HAMC insignias.  As applied to plaintiff, discretion to reject plaintiff's correspondence is circumscribed by the specific categories of prohibited content enumerated in Directive 10.7.  In light of plaintiff's known criminal history and his role within HAMC, the Court cannot find that Directive 10.7 was applied in an arbitrary manner to reject plaintiff's correspondence bearing HAMC indicia or code.  Further, the Directive limits any unfettered discretion on the part of prison staff by providing for procedures for review of the decision to reject correspondence by the Unit Administrator.

Accordingly, plaintiff has not demonstrated that the regulation is unconstitutionally vague, and summary judgment will be granted in favor of the defendants.

## CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment [doc. #73] is GRANTED, and plaintiff's motion for summary judgment [doc. #63] is DENIED. The Clerk is instructed to enter judgment in favor of defendants and to close this case.

Dated this _21___ day of August, 2012 at Bridgeport, Connecticut.

_____/s/_____
Warren W. Eginton
Senior United States District Judge